<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANN LEWANDOWSKI** and **ROBERT GREGORY**, *on their own behalf, on behalf of all others similarly situated, and on behalf of the Johnson & Johnson Group Health Plan and its component plans,*<br><br>Plaintiffs,<br><br>v.<br><br>**JOHNSON AND JOHNSON,** *et al.*,<br><br>Defendants. | Civil Action No. 24-671 (ZNQ) (RLS)<br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion to Dismiss Counts One and Two of the Second Amended Complaint (the "Motion," ECF No. 75) filed by Defendants Johnson and Johnson ("J&J") and the Pension & Benefits Committee of Johnson and Johnson (collectively, "Defendants[1]"). Defendants submitted a Brief in support of their Motion. ("Moving Br.," ECF No. 75-1.) Plaintiffs Ann Lewandowski and Robert Gregory, individually, on behalf of all others similarly situated, and on behalf of the J&J Group Health Plan and its component plans (hereinafter, "Plaintiffs"), filed a Brief in Opposition ("Opp'n Br.," ECF No. 77), to which Defendants submitted a Reply ("Reply Br.," ECF No. 81).[2]

---

[1] The Motion to Dismiss does not challenge Count Three of the SAC in which Plaintiff Lewandowski asserts a claim for failure to provide certain plan documents upon request.
[2] Amy B. Monahan, an unrelated third party, filed a Motion for Leave to File a Brief of Amicus Curiae in Support of Plaintiffs' Opposition Brief. ("Amicus Brief Motion," ECF No. 80.) Defendants filed a Brief in opposition. (ECF No. 82.) The Court notes that it considered the proposed Amicus Brief in drafting this Opinion.

1

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.[3] For the reasons set forth below, the Court will **GRANT** the Motion.

I.      **BACKGROUND AND PROCEDURAL HISTORY**

This case arises from various alleged breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, stemming from purported mismanagement of prescription drug benefits for J&J employees who were participants in its health benefit plans. (Second Am. Compl. (hereinafter, "SAC") ¶ 3, ECF No. 74.) Plaintiffs, individually and on behalf of a proposed class, seek: (1) damages to enforce Defendants' liability under 29 U.S.C. § 1109 and "to make good to the plans and their participants and beneficiaries;" and (2) an injunction enjoining Defendants from breaching their fiduciary duties. (*Id.* ¶ 11.)

    A.      **FACTUAL BACKGROUND**

J&J is a medical technologies and pharmaceutical company that sponsors the Salaried Medical Plan and Salaried Retiree Medical Plan (the "Plans") for its current and former employees. (*Id.* ¶ 15.) Plaintiffs are former employees of J&J and are current participants in the Plans. (*Id.* ¶¶ 12–13.) The Pension & Benefits Committee of J&J is the administrator of the Plans. (*Id.* ¶ 17.)

Plaintiffs allege that "Defendants breached their fiduciary duties and mismanaged [J&J]'s prescription-drug benefits program, costing their ERISA plans and their employees millions of dollars in the form of higher payments for prescription drugs, higher premiums, higher out-of-pocket costs, higher deductibles, higher coinsurance, [and] higher copays." (*Id.* ¶ 3.) For example, Plaintiffs cite the pricing of a multiple sclerosis generic drug, for which the Plans pay substantially

---

[3] Hereinafter, all references to the Rules refer to the Federal Rules of Civil Procedure unless otherwise noted.

more than large retail pharmacies charge without insurance. (*Id.*) Plaintiffs allege that "[n]o prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is *two-hundred-and-fifty* times higher than the price available to any individual who just walks into a pharmacy and pays out-of-pocket." (*Id.* (emphasis in original).) Plaintiffs cite to other large discrepancies in the Plans' pricing for certain "specialty" drugs, both branded and generic. (*Id.* ¶ 5.) Plaintiffs say no prudent fiduciary would have agreed to these terms. (*Id.* ¶ 6.) Instead of using more reasonable, "cost-effective" options for its participants, Defendants "force[d] its benefits plans and covered employees and retirees to acquire drugs via some of the most expensive methods conceivable." (*Id.* ¶ 9.)

Through the SAC, Plaintiffs again target generic drugs, alleging that "Defendants imprudently managed the Plans' generic drug program, and failed to act in the best interest of participants/beneficiaries and ensure that expenses were reasonable" for its participants and beneficiaries. (*Id.* ¶ 92.) Plaintiffs cite examples of drugs that were subject to a significant markup. (*See, e.g., id.* ¶¶ 107, 110, 112, 114, 116, 120, 121, 122, 123.) Plaintiffs include a chart illustrating how much the Plans paid for a selection of drugs as compared to a pharmacy acquisition cost. (*Id.* ¶ 118.)

Plaintiffs also accuse Defendants of mismanagement insofar as they: (1) agreed to steer beneficiaries toward a mail-order pharmacy that charges higher prices than retail pharmacies for the same drug (*id.* ¶ 131); (2) failed to incentivize the use of high-priced branded drugs in favor of lower-priced generic drugs (*id.* ¶ 137); (3) failed to engage in a prudent and reasoned decision-making process before agreeing to a PBM contract that required participants to pay a higher price for drugs (*id.* ¶ 141); and (4) failed to adequately negotiate the Plans for lower prices (*id.* ¶ 142).

### B.   PROCEDURAL HISTORY

Lewandowski filed the initial Complaint on February 5, 2024.  (ECF No. 1.)  Defendants submitted a Motion to Dismiss (ECF No. 40) that was later withdrawn after Lewandowski filed an Amended Complaint.  (ECF No. 44.)  Thereafter, Defendants filed a second Motion to Dismiss on June 28, 2024.  (ECF No. 51.)  The Court granted in part and denied in part the second Motion to Dismiss on January 24, 2025.  (ECF Nos. 70, 71.)  On March 10, 2025, Lewandowski and Gregory filed the SAC.  (ECF No. 74.)

### C.   SECOND AMENDED COMPLAINT

Plaintiffs made several alterations to their SAC.

First, the SAC adds Robert Gregory as a plaintiff.  (*Id.* ¶ 13.)  Gregory is a J&J retiree and is enrolled in J&J's Group Health Plan as a retiree.  (*Id.*)

Next, the SAC adds new allegations pertaining to premiums.  Plaintiffs assert that "employee contributions in the form of premiums will increase when plans overspend on prescription drugs," (*id.* ¶ 198) and cites to several reports and articles to support this statement (*id.* ¶¶ 199–205).  Furthermore, Lewandowski insists that she was "required to pay more in both employee premium contributions and COBRA premiums than she would have been required to pay absent Defendants' fiduciary breaches."  (*Id.* ¶ 210.)  Similarly, Gregory asserts that, since his retirement, his "premium contributions are even greater than the amount he paid as an employee."  (*Id.* ¶ 211.)

Additionally, the SAC adds new allegations pertaining to out-of-pocket costs.  Lewandowski asserts that, "even though she nominally hit her 'out-of-pocket maximum[,]'" "Defendants' unlawful conduct caused [her] to pay more out-of-pocket for prescription drugs than she otherwise would have paid."  (*Id.* ¶ 213.)  Lewandowski notes that she utilized a co-pay

4

assistance card to help pay for her out-of-pocket costs for an infusion. (*Id.* ¶ 224.) Gregory similarly asserts that he paid more out-of-pocket for a generic drug in October 2024. (*Id.* ¶¶ 234–240.)

## II. SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e) and (f) as Plaintiffs bring this action pursuant to ERISA.

## III. DISCUSSION

The SAC contains nearly the same three counts asserted in the Amended Complaint. First, Plaintiffs allege that Defendants breached their fiduciary duties under 29 U.S.C. §§ 1104(a) and 1132(a)(2). (*See generally* SAC.) Second, Plaintiffs allege that Defendants breached their fiduciary duties in violation of 29 U.S.C. §§ 1104(a) and 1132(a)(3). (*Id.*) Third, Lewandowski alleges that Defendants failed to provide documents upon request in violation of 29 U.S.C. §§ 1024(b)(4) and 1132(c). (*Id.*)

In the Motion, Defendants challenge both Plaintiffs' standing and the adequacy of the pleading as to Counts One and Two. Because Plaintiffs' standing is a jurisdictional issue, the Court considers this issue first. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).

### A. STANDING

The Motion again challenges Plaintiffs' standing on the basis that they do not allege a concrete harm or injury-in-fact. In Defendants' view, Plaintiffs still lack Article III standing as to their premium allegations, as the act of setting premiums is a non-fiduciary function that cannot support standing for fiduciary claims. Additionally, Defendants reiterate that Plaintiffs' higher premiums theory and their out-of-pocket theories are speculative.

Plaintiffs argue that the SAC cures any deficiencies and maintain that they have standing to pursue their claims.

1. Legal Standard

Article III of the United States Constitution confines the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const. Art. III. For there to be a controversy under Article III, the plaintiff must have a "'personal stake' in the case—in other words, standing. *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)). To have standing, a plaintiff must show: (1) that he or she suffered an injury in fact that is concrete, non-hypothetical, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In order "[t]o establish [an] injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements as to each claim. *FW/PBS, Inc. v. Dallas*, 492 U.S. 215, 231 (1990).[4]

In addition to having Article III standing, an ERISA plaintiff must also have statutory standing." *Edmonston v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 419 (3d Cir. 2013). "'Statutory standing is simply statutory interpretation,' and [courts] ask whether the remedies provided for in ERISA allow the particular plaintiff to bring the particular claim." *Id.* (quoting *Graden v. Conexant Sys. Inc.*, 495 F.3d 291, 295 (3d Cir. 2007)).

---

[4] "In the context of a class action, Article III must be satisfied by at least one named plaintiff." *Neale v. Volvo Cars of N. Am.*, 794 F.3d 353, 359 (3d Cir. 2015); *see also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

6

When a party challenges standing, the Court's analysis depends on whether the challenge is based on a "factual attack" or a "facial attack." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "[A] facial attack 'contests the sufficiency of the pleadings,' 'whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (quoting *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008)). Here, Defendants raise a facial challenge to Plaintiffs' standing, so the Court applies the standard for reviewing motions to dismiss under Rule 12(b)(6).[5] *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Although Plaintiffs bear the burden of establishing jurisdiction, upon reviewing a facial attack, a "court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). To overcome a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not contain "detailed factual allegations," but it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

    2.    <u>Analysis</u>

For the reasons set forth below, the Court finds that Plaintiffs lack Article III standing to pursue their claims under Counts One and Two. Plaintiffs' alleged injuries are that they suffered economic harms in the form of higher premiums and out-of-pocket costs. Although economic

---

[5] Generally, courts may not consider matters outside the pleadings on a motion to dismiss under Rule 12(b)(6). *See Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). However, a "court must only consider the allegations of the complaint and documents referenced therein and attached thereto." *Id.* Here, the Court need not look beyond the pleadings and the Plan documents submitted by Defendants, which are referenced within the SAC. *See id.* Thus, the Court construes Defendants' Motion as a facial attack on Plaintiffs' standing.

7

harms are the "most obvious concrete harms," *TransUnion*, 594 U.S. at 425, Plaintiffs' alleged injuries fail to meet the requirements for Article III standing.

Since this Court's decision granting in part and denying in part Defendants' prior Motion to Dismiss, a district court in the District of Minnesota issued a decision in *Navarro v. Wells Fargo & Co.*, Civ. No. 24-3043, 2025 WL 897717 (D. Minn. Mar. 24, 2025). In that case, former Wells Fargo employees and participants in the company's health plan alleged that Wells Fargo mismanaged the plan's employee prescription drugs benefit program, resulting in higher premiums and out-of-pocket costs for participants. *Id.* at *1. The court found that plaintiffs were "unable to show concrete individual harm, causation, and redressability," and, as such, lacked standing. *Id.* The court did however agree with plaintiffs that the harms they alleged "could constitute injury-in-fact for standing purposes," but ultimately plaintiffs' alleged harm was speculative and thus not redressable. *Id.* at *5.

This Court finds *Navarro* persuasive and applies that court's reasoning. The *Navarro* court identified the plan as a "defined-benefits plan." *Id.* at *6. "Such plans are typically 'funded by employer or employee contributions[] or a combination of both,' and consist of 'a general pool of assets rather than individual dedicated accounts.'" *Id.* (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999)). The court noted that "'[t]he structure of a defined benefit plan reflects the risk borne by the employer. Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool.'" *Id.* (citing *Hughes Aircraft*, 525 U.S. at 440)). "'[B]enefits under a defined-benefit plan "do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions."'" *Id.* (quoting *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 862 (D. Minn. 2024)) (quoting *Thole v. U.S. Bank N.A. ("Thole II")*, 590 U.S. 538, 540 (2020))). The court

explained that "the plaintiffs relinquished any individual interest in their contributions once those contributions became part of the plan's 'general pool of assets,'" and that a "diminution of those assets [did] not affect plaintiffs' entitlement to benefits in any way and therefore [did] not cause plaintiffs any injury.'" *Id.* (quoting *Thole II*, 590 U.S. at 862) (alterations in original).

The *Navarro* court compared the facts before it to those in *Knudsen v. MetLife Group Inc.*, a case this Court relied upon when issuing its decision related to Defendants' prior Motion to Dismiss. 117 F.4th 570 (3d Cir. 2024). As explained in *Navarro*:

> The underlying argument Plaintiffs advance, while different in the specifics, is essentially the same as in *Knudsen*: had Wells Fargo more closely monitored the Plan's prescription drug costs and negotiated a better deal with ESI, replaced ESI with a different PBM, or adopted a different model altogether, the Plan would have paid less in administrative fees and other compensation to ESI, which would have resulted in lower participant contributions and out-of-pocket costs. Plaintiffs' theory appears tempting at first blush, but it withers upon closer scrutiny.

*Navarro*, 2025 WL 897717, at *8.

Here, as in *Navarro*, "the connection between what plan participants were required to pay in contributions and out-of-pocket costs, and the administrative fees the Plan was required to pay [the PBM], is tenuous at best." *See id.* at *9. Like Wells Fargo's plan, the Plans here also vest Defendants with "sole discretion" to set participant contribution rates. (*See* ECF No. 75, Ex. A, Plan Doc. § 4.01 ("The Sponsor shall establish each year the amount of Participant contributions . . ."); *see also* SAC ¶ 194.) Participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits, such as: group health plan market trends; administrative expenses; non-drug medical costs; the costs of other prescription drugs and categories of drugs; historical cost-sharing levels under the Plan; and other internal or external factors impacting employees. (*See* Moving Br. at 14; ECF No. 75, Ex. D, Declaration of Douglass

9

Grant, ¶ 2.) *See also Navarro*, 2025 WL 897717, at *9 ("The Plan's terms are clear that participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits, like whether a participant uses tobacco, whether a participant obtains coverage for her spouse or children in addition to herself, and a participant's 'compensation category.'"). And, like Wells Fargo's plan, the Plans here authorize Defendants to require participants to fund *all* plan expenses, not just expenses related to their own individual benefits. (*See* ECF No. 75, Ex. A, Plan Doc. § 4.02 ("Benefits under this Plan shall be funded through contributions made by the Company and by enrolled Participants.").) *See also Navarro*, 2025 WL 897717, at *9.

Put simply, it is too speculative that the allegedly excessive fees the Plan paid to its PBM "had any effect at all" on Plaintiffs' contribution rates and out-of-pocket costs for prescriptions. *See Knudsen*, 117 F.4th at 582. And, once again, Plaintiffs' attempts to establish a direct connection between their increased premium and out-of-pocket costs and increases in administrative fees paid by the Plans to the PBM are unconvincing. For example—just like in *Navarro*—Plaintiffs offer comparisons between the purchase prices for certain prescription drugs under the plan to the prices an uninsured person would pay at retail pharmacies for the same prescriptions or the acquisition costs paid by the pharmacies to obtain those drugs. (*See* SAC ¶¶ 105–118, 235–240.) Specifically, Plaintiffs point to the prices of 42 generic specialty drugs and 15 generic non-specialty drugs out of thousands of health services and drugs covered by the Plans. (*See id.*) These 57 comparisons pale in comparison to the 260 comparisons made in *Navarro*. *See Navarro*, 2025 WL 897717, at *9. The 57 comparisons here are a "narrow subset of the 'thousands' of drugs in the Plan[s]' full formulary." *Id.* And Plaintiffs are "only responsible for the full out-of-pocket costs for prescription drugs—whether preferred alternative, generic-specialty, or otherwise—until [they] meet[] their annual deductible, after which the Plan[s] cover[]

10

most of the costs for [Plaintiffs'] prescription drugs for the remainder of the year." *Id.* (*See also* Moving Br. at 4–5.)

Here, Lewandowski alleges that she overpaid $210 for two prescriptions in 2023. (SAC ¶¶ 141, 218–229.) However—in that same year—she received Plan benefits totaling over $200,000. (*Id.*) Similarly, Gregory claims he overpaid about $10 for one drug in 2024—a year he received more than $121,000 worth of benefits for both himself and his family members. (SAC ¶¶ 141, 235–237.) These selective allegations are not enough to establish the necessary causal connection. "There are simply too many variables in how Plan participants' contribution rates are calculated to make the inferential leaps necessary to elevate Plaintiffs' allegations from merely speculative to plausible." *Id.* (citing *Harris*, 729 F. Supp. 3d at 877).[6] Plaintiffs offer nothing but supposition to "fill in the necessary inferential gaps" and, as such, lack standing because their purported injury is not fairly traceable to Defendants. *See Knudsen*, 117 F.4th at 582.

Like the plaintiffs in *Navarro*, Plaintiffs here also attempt to avoid *Knudsen*'s finding as to redressability. *See id.* For example, Plaintiffs allege that "any reduction in overall healthcare spending—*e.g.*, if Defendants stopped causing the Plans to overspend on prescription drugs by millions of dollars each year—would result in proportionally lower employee contributions in accordance with the established contribution ratio. And, similarly, because Defendants caused the Plan[s] to overspend on prescription drugs, overall healthcare spending increased, and employee contributions in the form of premiums increased in tandem." (SAC ¶ 197.) As in *Navarro*, "Plaintiffs' argument fundamentally misses the point: if Plaintiffs prevailed in this case and received every bit of the relief they request, [Defendants] could *still* increase Plan participants'

---

[6] The SAC cites several reports and articles that indicate a pattern of higher employee contributions where plans spend more on prescription drugs. (SAC ¶¶ 198–205.) This theory still requires that all else be held constant—which is not feasible given the sheer size of the Plans, the multitude of factors affecting premium pricing, and Defendants' discretion to change those premiums. (*See id.* ¶ 204); *see also Finkelman v. NFL*, 810 F.3d 187, 201 (3d Cir. 2016).

contribution amounts under the Plan[s'] terms without any violation of ERISA having occurred." *Id.*; *see also Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (concluding that whether plan savings would have passed to plan participants was "too speculative to serve as the basis for . . . individual loss").

Here, Defendants have the sole discretion to set participant contribution rates. Plaintiffs cannot articulate how this Court could alter the terms of the Plans to expressly require Defendants to reduce or maintain participants' contribution amounts. Whether "removal of the current fiduciaries, appointment of an independent fiduciary, replacement of the Plans' PBMs, surcharge, restitution," or other remedies (SAC ¶ 282), "Plaintiffs' theory of redressability stumbles on the same obstacle"—Defendants' discretion to set participant contribution rates. *Navarro*, 2025 WL 897717, at *10. "Simply put, while Plaintiffs' requested relief *could* result in lower contribution rates and out-of-pocket costs, there is no guarantee that it *would*, and 'pleadings must be something more than an ingenious academic exercise in the conceivable' to meet the standing threshold." *Id.* (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973)).[7] Accordingly, the Court separately finds that Plaintiffs also lack standing based on the lack of redressability.

For the foregoing reasons, the Court finds that Plaintiffs lack standing to assert Counts One and Two of the SAC.

---

[7] Although creative, Lewandowski's argument pertaining to the copay assistance card she used to offset her out-of-pocket maximum does not cure the First Amended Complaint's defects. (*See* SAC ¶¶ 228–229, 213, 220–229.) Ultimately, it does not matter whether a plan participant reaches his or her deductible—the theory that alleged fiduciary breaches increased out-of-pocket costs is too speculative to support standing. *See Navarro*, 2025 WL 897717, at *10.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendants' Motion (ECF No. 75). Counts One and Two will be dismissed without prejudice for lack of Article III standing. Plaintiffs will be given leave to file a Third Amended Complaint within 30 days, limited to addressing the deficiencies identified in this Opinion. An appropriate Order will follow.

Date: November 26, 2025

                                                    s/ Zahid N. Quraishi
                                                  **ZAHID N. QURAISHI**
                                                  **UNITED STATES DISTRICT JUDGE**